Filed 7/24/15  P. v. Scott CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RICKEY LEON SCOTT,<br><br>        Defendant and Appellant. | A139921<br><br>(San Francisco County<br>Super. Ct. No. 219205) |

While waiting for services in a homeless shelter, appellant Rickey Leon Scott stabbed Abdul Smith, another client in the shelter.  He was convicted of first degree murder following a trial at which the jury was instructed on the lesser offenses of second degree murder and manslaughter, based on theories of accident, self-defense, imperfect self-defense and provocation.  Appellant argues the judgment must be reversed because (1) the jury foreperson committed misconduct in failing to disclose his prior misdemeanor conviction for making criminal threats and his dissatisfaction with his representation in that case by the same public defender's office that represented appellant; (2) the evidence was insufficient to support a conviction of first degree murder because there was no substantial evidence of premeditation and deliberation or lying in wait; (3) the trial court abused its discretion in admitting evidence appellant owned a second knife that was not used in the commission of the crime; and (4) a newly discovered witness could present testimony corroborating appellant's version of events. We affirm.

1

## I. FACTS AND PROCEDURAL HISTORY

The San Francisco District Attorney filed an information charging appellant with the murder of Smith and alleging he personally used a deadly weapon (a knife) in the commission of that offense. (Pen. Code, §§ 187, 12022, subd. (b).) The information also alleged appellant had suffered prior "strike" convictions and prior serious felony convictions. (Pen. Code, §§ 667, subd. (a), 1170.12.) The case proceeded to a jury trial, at which the following evidence was adduced.

### A. *Prosecution Evidence*

The St. Vincent de Paul shelter on Fifth Street and Bryant Street in San Francisco, also known as MSC South, provides services for homeless individuals. Clients must pass through metal detectors and security wands at the entrances to the shelter, and they are expected to check their weapons with security and reclaim them when they leave. A violation of this no-weapons policy will result in an individual being excluded from the shelter and its services. Despite the policy and its enforcement, it is not uncommon for clients of the shelter to carry knives for protection.

Appellant, who was homeless, went to the drop-in side of the shelter at about 4:55 p.m. on February 6, 2012, to sign up for a bed for the night. He was carrying a black computer bag that contained some of his personal effects and belongings, including a brown-handled folding knife and a black-handled steak knife. Appellant was aware of the shelter's no-weapons policy, but he did not check his two knives with security and was able to take them inside. Once inside, appellant sat down to wait in the entertainment area, which had a television and vending machines as well as 35 folding chairs.

Smith entered the drop-in side of the shelter at about 6:48 p.m. and went through security, giving the guard a hug. Shelter worker Jaime Torres noticed that Smith had been drinking, but he was not hostile or belligerent and he had no problems with his coordination. James Joyner, a program aide at the shelter, believed Smith was

2

intoxicated, but Smith had a mellow personality and was not being aggressive. Smith frequently came to the shelter and was generally quiet.

After passing through security, Smith walked into the entertainment area, passing near the chair where appellant was seated. He walked out of the entertainment area, retrieved a newspaper, and returned to the entertainment area a few minutes later. Someone yelled out "Fight!" and Smith staggered out of the entertainment area, bleeding, having been stabbed with a knife. Appellant followed Smith, but Joyner intercepted appellant and pushed him (appellant) up against a wall. Joyner described appellant as having "rage" in his eyes, and he thought appellant was going to "finish [Smith] off."[1] Appellant told Joyner to "back up" and Joyner complied, noticing a knife in appellant's hand as he did so. Blood was dripping from the knife. Appellant took his bag and ran out of the shelter after placing the knife inside his bag.

A video surveillance camera inside the shelter captured appellant's and Smith's entry into the shelter and their movements outside the entertainment area where the stabbing occurred. The video does not clearly show what happened between them when Smith was stabbed because a pillar obscures the view, although some movement can be seen. None of the shelter staff members on duty that evening saw the stabbing.

Whitey Pavao, who was a frequent client of the drop-in shelter, had been sitting in the entertainment area when Smith arrived. He testified that he noticed Smith walk through the entertainment area once and did not see him cause anyone any problems. Smith returned a second time and appellant said something to him like "I told you to stay away from here" or "I told you to stay away from me." Smith fell near the vending machines, and Pavao saw appellant wrap a "boning knife" in a shirt as he left. Pavao did not see the actual stabbing, but he heard appellant say something "like he won't rip off

---

[1] In a statement to a defense investigator in September 2012, Joyner said he had seen fear on appellant's face, like he was having a flashback. He described appellant's eyes as "really bulgy, the way some people look when they're trying to defend themselves," and said "if you're trying to defend yourself, you're feeling rage and scared at the same time." Asked about this statement at trial, Joyner testified that he had not seen the altercation itself or anything to indicate appellant was defending himself.

anybody anymore." According to Pavao, appellant stood up from his chair and "[t]hey had words, and the knife came out. [Appellant] hit [Smith] with the knife, and then he sat back down on the chair, wrapped it up in a shirt, and took off." Pavao saw Smith "standing in a self-defense stance" or "a fighter's stance, you know, in a ready stance." He did not see Smith hit, punch or kick appellant, and did not hear appellant ask Smith if he was okay after the stabbing.

Pavao provided a short, handwritten statement and was interviewed by police officers on the night of the stabbing. In his handwritten statement, he wrote, "I also heard the man who did the stabbing what sounded like an altercation about having money stolen, and then he stabbed him, but it was marked for real." In the interview, Pavao told police officers that Smith had been walking around in the entertainment area and appellant "went and got out of the chair and stalking with that knife." Appellant "came off the chair and he—he literally, he literally attacked him." After Smith had been stabbed, Smith said, "I guess I'm gonna die," and appellant told Smith something to the effect of "I guess you're not gonna rip anybody off anymore." Pavao did not see Smith hit or kick appellant before the stabbing.[2]

After appellant left the shelter, he threw his folding knife up onto the roof of a building and headed to a homeless encampment under a freeway off-ramp less than a block away. At the encampment, appellant took off the hat he had been wearing inside the shelter and threw it on the ground along with his black bag.

As appellant was leaving the homeless encampment, he was stopped by San Francisco Police Department Sergeant Joseph Allegro, who had received a dispatch about

---

[2] In a statement given to a defense investigator on September 27, 2012, Pavao said he did not hear appellant say anything about getting "ripped off," but had heard other clients speculating about that possibility after the stabbing. Pavao explained the discrepancy at trial: "I couldn't have been sure that they were arguing about money at the time of the interview, but I can remember now that he talked about—talked about ripping off somebody and money before the altercation happened." Pavao also told the defense investigator that before he was stabbed, Smith assumed a "leaned back fighting stance with fists closed, both of them one foot forward and one foot back."

the stabbing. Allegro asked appellant what he was doing and appellant responded, "Taking a pis[s]." Officers detained appellant. At some point, Allegro asked appellant where he planned to sleep that night, and appellant responded, "County jail." Referring to the homeless encampment, Allegro asked, "Not back there?" and appellant said, "I don't live back there, that's somebody else's stuff." Appellant had a fresh cut on the inner palm side of his right index finger. According to Homicide Inspector John Evans of the San Francisco Police Department, it is common for stabbing suspects to have wounds from the knife wielded because a knife has a tendency to slip forward when it strikes something.

Police searched the homeless encampment and found appellant's hat and computer bag. The bag contained his steak knife wrapped in a cardboard sandwich bag box, buried underneath more plastic bags. Appellant's folding knife was recovered from the rooftop where appellant had thrown it. DNA samples were taken from each knife and it was determined that the folding knife carried Smith's DNA, but the steak knife carried only appellant's. The parties stipulated that the folding knife was the knife that caused Smith's wound, and that the steak knife was not used to harm Smith.

The autopsy on Smith's body revealed that he had died from a stab wound to the heart. He did not have any defensive wounds, which is consistent with a surprise attack.

B. *Defense Evidence*

Appellant testified about the circumstances surrounding the stabbing, which he described as an accident. He explained that although he knew of the shelter's no-weapons policy, shelters are dangerous places and he felt he needed a knife for protection. He used the folding knife for protection and the steak knife (which he had found that same day) to cut sandwiches. Appellant claimed the security guard at the shelter's entrance saw the knives when he searched appellant's computer bag, but let him go through without taking them away. Once inside and seated in the entertainment area, appellant put the folding knife into his jacket pocket for protection.

5

Appellant spoke to another shelter client called "Bubble" and dozed off in the chair. He was awakened when Smith fell into him and hit him in the face or shoulder. Appellant recognized Smith from an encounter in 2005 or 2006, when Smith had tried to kick appellant's legs out from under him due to a dispute over a trivia game. Appellant had not taken Smith's behavior seriously and would sometimes give him a dollar when he saw him on the street during the ensuing years.

Smith walked over to the vending machines and gave appellant a taunting look. He left the entertainment area, and appellant got up to smoke a cigarette outside. Appellant saw Smith walking back to the entertainment area holding a partially rolled-up newspaper. Appellant was uneasy because he knew people sometimes hid weapons inside newspapers, so as Smith approached, appellant took out his folding knife and told Smith to "back up." Smith came right at him and either walked or lunged into the knife. Appellant only intended to scare Smith, and did not strike at him or thrust the knife into his chest. He had not seen a weapon in Smith's hand.

When appellant felt the knife enter Smith's chest, he threw it on the floor.[3] He followed Smith asking him if he was all right, but Joyner pushed him (appellant) against the wall. Bubble kicked the knife toward appellant and told him to pick it up, and appellant took it and left the shelter in shock. Appellant knew the police would be coming but he wanted to go outside and get some air. He acknowledged throwing the folding knife onto the roof of a building.

Dr. Judy Melinek, the medical examiner who performed the autopsy on Smith's body, testified that the knife wound that killed Smith was horizontal and penetrated two to three inches into Smith's heart, less than the length of the folding knife's blade. A diagonal wound is more common in stabbing cases, and a horizontal wound is consistent with someone running into a knife, though the knife could also be thrust into someone's body at a horizontal angle. The horizontal nature of the wound does not necessarily mean

---

[3] Paul Endo, the defense expert in videography, testified about an enhanced version of the surveillance video he had prepared and identified a movement on the video as being consistent with a knife being thrown, and not with a striking motion.

the knife was parallel to the ground when it entered Smith's body, as Smith could have been bending over.

Smith's body had a 0.21 blood alcohol level at the time of the autopsy and a vitreous (eye fluid) alcohol level of 0.29 percent. In light of the intravenous fluids and blood transfusion given to Smith during lifesaving efforts, his blood alcohol level could have been as high as 0.29 percent, which would cause serious impairment. According to Dr. Alex Stalcup, the defense expert on alcohol intoxication, blood alcohol at that level could cause someone to become aggressive, or to fail to appreciate danger or feel threatened when they were not, even though regular users of alcohol can build up a tolerance. Shelter worker Jeynitha Richardson testified that Smith appeared to be "staggering drunk" when he arrived at the shelter on the night of the stabbing, but he was not angry or aggressive and could control his movements.

Dr. Margo Kushel, a defense expert on homelessness, testified that most of her homeless patients were afraid for their safety in homeless shelters, which were rough places. Homeless individuals could be hypervigilant and prone to reacting with slight provocation.

C. *Verdict and Posttrial Proceedings*

The jury returned a verdict convicting appellant of first degree murder and finding he had used a deadly weapon in the commission of the offense. (Pen. Code, §§ 187, 12022, subd. (b)(1).) Appellant filed a motion seeking a new trial based on juror misconduct and a separate motion seeking a new trial based on the return of a verdict contrary to the evidence, the admission of prejudicial evidence due to the court's error of law, and newly discovered evidence. (Pen. Code, § 1181, subds. 3, 5, 6 & 8.) The trial court denied the motions after holding an evidentiary hearing on the juror misconduct issue.

The court sentenced appellant to prison for "86 years to life" (actually, 75 years to life plus 11 years), having found appellant had been previously convicted of two prior felony convictions for purposes of the Three Strikes law and the serious felony

7

enhancement. (Pen. Code, §§ 667, subd. (a), 1170.12.)[4] The sentence consisted of a term of 25 years to life for the murder conviction, tripled under the Three Strikes law, plus two five-year terms for the serious felony enhancements and a one-year term for the weapon use allegation. (Pen. Code, §§ 190, subd. (a), 667, subd. (a), 1170.12, subd. (c)(2)(A)(i), 12022, subd. (b)(1).)

## II. DISCUSSION

### A. *Juror Misconduct*

#### 1. Motion for New Trial and Relevant Proceedings

Appellant contends the trial court should have granted his motion for new trial based on juror misconduct under Penal Code section 1181, subdivision 3, which applies when "the jury has . . . been guilty of any misconduct by which a fair and due consideration of the case has been prevented." We disagree.

The factual basis for the juror misconduct claim was that Juror No. 8, the foreperson, failed to disclose during voir dire that he had suffered a misdemeanor conviction in 2009 and was unhappy with his representation by his deputy public defender, who worked for the same office as appellant's trial counsel. The declarations, testimony and exhibits presented in support and opposition of the motion for new trial on this ground established the following:

Juror No. 8 was convicted on July 22, 2009 of a misdemeanor count of making a criminal threat under Penal Code section 422 following a jury trial at which he was represented by deputy public defender Emily Dahm of the public defender's office in San Francisco. The charges arose from an incident in which Juror No. 8 had threatened a parking control officer while she was issuing him a citation. At the sentencing hearing

---

[4] The trial court struck its true findings on allegations based on an additional prior conviction for aggravated assault under Penal Code section 245, subdivision (a)(1), because the record of that prior conviction showed the assault was committed with hands and fists, rather than a deadly weapon, meaning it did not qualify as a serious or violent felony. (See *People v. Rodriguez* (1998) 17 Cal.4th 253, 262; *People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1034.)

held on September 25, 2009, Juror No. 8 was placed on probation and ordered to serve five days in county jail. Dahm filed a notice of appeal on Juror No. 8's behalf, and private attorney Marsanne Weese was appointed to represent him in the appellate division of the superior court. Weese filed a brief stating she could find no arguable issues on appeal and asking the appellate division to independently review the record under *People v. Wende* (1979) 25 Cal.3d 436, and the appellate division affirmed the judgment in an opinion filed March 28, 2011.

On May 2, 2011, Dahm appeared on behalf of Juror No. 8 in superior court, at which time the remittitur was "spread upon the minutes," that is, read into the record. Juror No. 8 was not present for this proceeding. He had not communicated with Dahm since his sentencing hearing in 2009 and was unaware of his appeal, the identity of his appointed counsel on appeal, or of the hearing at which the remittitur was spread. Juror No. 8 believed he had been wrongfully convicted and was highly dissatisfied with the representation provided by Dahm.

Juror No. 8 was called for jury service and assigned to the panel in appellant's case. Appellant was represented at trial by Jeff Adachi, the elected Public Defender of the City and County of San Francisco. Before voir dire began on March 18, 2013, the jurors completed a written questionnaire. Question No. 24 asked, "Have you, a family member, or a close friend ever been investigated, arrested, charged with, or convicted of any crime?" Juror No. 8 responded no. Question No. 27 asked, "What are your opinions, if any, of prosecutors and/or criminal defense attorneys?" Juror No. 8 wrote, "NA." Question No. 38 asked, "The judge will instruct you as follows: Do not let bias, sympathy, prejudice or public opinion influence your decision. You must reach your verdict without any consideration of punishment. Is there any reason you would be unable to comply with this order?" Juror No. 8 answered no. Question No. 61 asked, "Is there any matter not covered in this questionnaire that you think the attorneys or court should know when considering you as a juror in this case?" and "Is there any other reason why you might not be able to be an impartial judge of the facts for both the prosecution and defense in this case?" Juror No. 8 responded no to both parts of the question. He

9

also indicated he did not know the prosecutor or "[d]efense lawyer and Public Defender Jeff Adachi." During voir dire itself, Adachi asked the prospective jurors whether anyone had negative feelings about defense attorneys, and Juror No. 8 did not raise his hand or otherwise reply. On March 21, 2013, the jury and six alternate jurors were impaneled.

On April 12, 2013, the day of the verdict in appellant's case, Dahm was in the courthouse on another matter and ran into Juror No. 8 in the hallway. Although Juror No. 8 did not recognize her at first (she had been pregnant and had longer hair when she represented him in 2009), they had a brief and friendly conversation. Juror No. 8 told Dahm he was going to go do his civic duty, which led Dahm to believe he had been called for jury duty, but she saw him later in the day outside the courtroom where appellant's case was being tried and learned at that time he was on appellant's jury. Dahm knew Adachi was trying the case and told Juror No. 8 she could not talk to him and asked him to contact her when the case was over. She emailed Adachi to advise him that a former client was on his jury, and Adachi reviewed Juror No. 8's questionnaire during the following week, after the jury had returned its verdict. Had Adachi known of Juror No. 8's prior relationship with his office, he would have exercised a challenge and removed him from the jury panel.

Juror No. 8 testified at the hearing on the motion for new trial under a grant of immunity and while represented by counsel. He explained that he had not disclosed his 2009 conviction on the jury questionnaire because over three years had passed and he was trying to forget about it. He felt he could be fair and impartial when he was selected to be a juror in appellant's case, though he fretted extensively over the possibility that an unconscious bias based on his experience with Dahm might have affected his jury service. He was not trying to cheat appellant out of a fair trial and he did not recall holding any of his negative feelings about Dahm against appellant. He did not have any negative feelings about appellant or Adachi, and he did not realize Adachi was from the same office as Dahm. He also did not realize that the prosecutor in appellant's trial was from the same office as the prosecutor in his misdemeanor case. Juror No. 8's daughter,

who had witnessed her father's arrest in 2009, testified that he did not discuss the incident leading to his conviction very often because it was upsetting to his wife, but that he had alluded to it several times during 2012. Though her father sometimes told small lies and exaggerated things, she believed he was an honest person and would not vote to convict somebody else simply because he believed he himself had been wrongfully arrested and convicted.

The trial court issued a detailed written order denying the motion for new trial. Citing *People v. Blackwell* (1987) 191 Cal.App.3d 925, 929 (*Blackwell*), it concluded Juror No. 8 had committed misconduct by falsely indicating on the questionnaire that he had not been convicted of a crime, which gave rise to a presumption of prejudice. The trial court found this presumption had been rebutted, the evidence having shown no substantial likelihood Juror No. 8 harbored actual bias against appellant. The trial court rejected appellant's argument that bias should be implied under Code of Civil Procedure section 229, subdivision (b), which sets forth the grounds for a challenge for cause based on implied bias, or under case law recognizing that a juror's bias may be implied under exceptional circumstances. Finally, the court concluded a new trial was not required under *McDonough Power Equipment, Inc. v. Greenwood* (1984) 464 U.S. 548, 555-556 (*McDonough*), which addresses the effect of a juror's untruthful response during voir dire where a truthful response would have provided a valid basis for a challenge for cause.

Appellant argues the trial court erred in denying his motion for new trial based on juror misconduct because (1) Juror No. 8's failure to disclose his 2009 misdemeanor conviction was misconduct giving rise to a presumption of prejudice that was not rebutted by the prosecution, and (2) the public defender's prior representation of Juror No. 8 established implied bias giving rise to a challenge for cause, which entitles appellant to a new trial under *McDonough*, *supra*, 464 U.S. 548.

2. Juror Misconduct; Actual Bias

" 'A juror who conceals relevant facts or gives false answers during the voir dire examination . . . undermines the jury selection process and commits misconduct.

11

[Citations].' " (*In re Boyette* (2013) 56 Cal.4th 866, 889 (*Boyette*), citing *In re Hitchings* (1993) 6 Cal.4th 97, 111.) Once misconduct is established, it raises a presumption of prejudice. (*People v. Nesler* (1997) 16 Cal.4th 561, 578 (*Nesler*); *People v. Stanley* (1995) 10 Cal.4th 764, 836.) This presumption "excuses the defendant from affirmatively proving prejudice when that cannot be done" and "prevails ' "unless the contrary appears." ' " (*In re Carpenter* (1995) 9 Cal.4th 634, 657.)

Notwithstanding the presumption of prejudice that arises from a juror's concealment of material information, "we determine whether an individual verdict must be reversed for jury misconduct by applying a substantial likelihood test. That is, the 'presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant.' " (*Boyette*, *supra*, 56 Cal.4th at pp. 889-890.) "[T]he test asks not whether the juror would have been stricken by one of the parties, but whether the juror's concealment (or nondisclosure) evidences bias." (*Id*. at p. 890.) Whether prejudice arose from juror misconduct is a mixed question of law and fact subject to an appellate court's independent review, accepting the trial court's credibility determinations and findings of historical fact when supported by substantial evidence. (*People v. Gamache* (2010) 48 Cal.4th 347, 396 (*Gamache*); *People v. Ault* (2004) 33 Cal.4th 1250, 1261-1263; *Nesler*, *supra*, 16 Cal.4th at p. 582.)

The parties agree Juror No. 8 committed misconduct when he did not reveal his 2009 misdemeanor conviction on his questionnaire. The issue is whether the presumption of prejudice that arises from this misconduct was rebutted—whether the record establishes there was no substantial likelihood Juror No. 8 was actually biased against appellant. We answer this question in the affirmative.

In assessing whether the presumption of prejudice arising from a juror's concealment of a material fact has been rebutted, "the court should . . . determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the

juror's failure to respond." (*Blackwell*, *supra*, 191 Cal.App.3d at p. 930.) Although Juror No. 8 unquestionably should have disclosed his misdemeanor conviction for criminal threats, prejudice against appellant cannot reasonably be inferred from his false answer to the jury questionnaire. The circumstances leading to the misdemeanor conviction were completely different than the facts underlying appellant's murder charge, and no bias against appellant appears from the misdemeanor conviction itself.

The dissimilarity between the events leading to Juror No. 8's conviction and the homicide with which appellant was charged distinguishes the situation before us from the prejudicial juror misconduct in *Blackwell*, *supra*, 191 Cal.App.3d at pp. 929-931. The defendant in *Blackwell* was a woman convicted of murdering her husband, who presented a defense of " 'battered wife syndrome.' " (*Id*. at p. 927.) After the verdict was rendered, it was discovered that a female juror who had been the victim of domestic violence had failed to disclose as much during voir dire. (*Id*. at p. 928.) The court concluded that under the circumstances of the case, prejudice could not be rebutted: "[The defendant's] defense was that her husband's abusive conduct caused her to entertain an honest, even if unreasonable, belief in the necessity to defend herself against imminent bodily injury. [Citation.] Juror R.'s affidavit reveals her bias: when confronted with a situation similar to [the defendant's], she was able to escape an abusive husband without resort to physical violence or self-defense. She felt that if she could do so appellant should have governed herself accordingly. As a consequence, the presumption of prejudice is even stronger." (*Id*. at p. 931; see *People v. Diaz* (1984) 152 Cal.App.3d 926, 930-932 (*Diaz*) [in trial on assault with a deadly weapon charge, court should have discharged juror after learning on the last day of trial that she had been a victim of a knifepoint attack and had concealed that fact during voir dire]; compare *Boyette*, *supra*, 56 Cal.4th at pp. 889-890 [juror's concealment of criminal history and substance abuse issues of himself and his close family members was not prejudicial because concealment did not suggest actual bias].)

The actual bias that might logically flow from Juror No. 8's prior misdemeanor case was not his prosecution and conviction per se, but the fact he had been represented by the same public defender's office that was representing appellant, and was unhappy

13

with his attorney. But even if we accept that a juror who was disgruntled with his representation in a prior criminal case might be biased against a different lawyer from the same organization, and that this bias might affect his ability to be fair to the party represented by the lawyer, this could only occur where the juror had made the connection between the two lawyers. In this case, Juror No. 8 testified that he had not understood Adachi and Dahm worked in the same office. The trial court accepted this historical fact and found Juror No. 8 to be credible on this point, a factual determination by which we are bound. (*Gamache*, *supra*, 48 Cal.4th at p. 396.) In light of this, there is no substantial likelihood Juror No. 8 was biased against Adachi, much less against appellant, by virtue of his misdemeanor conviction or his representation by Dahm.[5]

Appellant notes that during his testimony at the hearing on the motion for new trial, Juror No. 8 expressed concern about the effect his misdemeanor conviction might have had on his deliberations. It is true Juror No. 8 made a number of statements speculating that his prior conviction might have affected his performance in appellant's case in some way: "You know, I was upset about that verdict from before, so it was in me, you know, but I didn't act like it didn't matter or it wasn't going to matter when I answered that [the questionnaire]. I would have liked to forget about it, but maybe I didn't. [¶] . . . [¶] [L]ike I say, I'm not a psychologist, but it's there, and I guess, yeah, I guess it could have affected it, you know, the decision that I made, so yes." But at no point could Juror No. 8 explain *how* that conviction might have affected his service in appellant's case, and he also indicated he wanted both sides to have a fair trial and would have informed the court if he had believed there was some reason he could not give both sides a fair trial.

The trial court concluded that Juror No. 8's speculation about his possible unconscious bias was the product of his anxiety during the new trial hearing, at which he

---

[5] Although Dahm testified that she had met with Juror No. 8 at the public defender's office while she was representing him and was confident he knew at that time that she worked for the public defender, there is nothing inherently improbable about a layperson failing to connect her with Adachi after a gap of more than three years.

did not initially appear to appreciate he had been granted immunity from a prosecution for perjury. The court determined Juror No. 8 was truthful when he testified that when he filled out the questionnaire he believed he could give appellant a fair trial—a credibility determination to which we defer. (*Gamache*, *supra*, 48 Cal.4th at p. 396.)

Our independent review of the record satisfies us that there is no substantial likelihood Juror No. 8 was actually biased. The presumption of prejudice arising from his concealment of his misdemeanor conviction and prior representation was adequately rebutted.

### 3. *McDonough* and Code of Civil Procedure section 229, subdivision (b)

Under California law, a juror may be challenged for cause for one of the following reasons: "(A) General disqualification—that the juror is disqualified from serving in the action on trial. [¶] (B) Implied bias—as, when the existence of the facts as ascertained, in judgment of law disqualifies the juror. [¶] (C) Actual bias—the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party." (Code Civ. Proc., § 225, subd. (b)(1)(A)-(C).) Code of Civil Procedure section 229 provides in relevant part: "A challenge for implied bias may be taken for one or more of the following causes, and for no other: [¶] . . . [¶] (b) . . . having stood within one year previous to the filing of the complaint in the action in the relation of attorney and client with either party or with the attorney for either party."

Appellant argues that Juror No. 8's prior representation by the public defender's office (which would have come to light if the 2009 misdemeanor had been revealed) subjected that juror to a challenge for cause based on implied bias under Code of Civil Procedure section 229, subdivision (b). He further argues that Juror No. 8's failure to disclose that information during voir dire entitles appellant to a new trial as a matter of federal law based on the decision in *McDonough*, *supra*, 464 U.S. 548, regardless of whether the record establishes a substantial likelihood of actual bias.

15

We agree with appellant that his trial attorney, Jeff Adachi, had an attorney-client relationship with Juror No. 8 in the 2009 misdemeanor case. (*People v. Sapp* (2003) 31 Cal.4th 240, 256 [" 'In cases handled by the public defender's office, it is the officeholder who is the attorney of record' "].) And, in light of Dahm's court appearance on behalf of Juror No. 8 on May 2, 2011, at the hearing to spread the remittitur, we assume that attorney-client relationship still existed "within one year previous to the filing of the complaint" in appellant's case, as required for Code of Civil Procedure section 229, subdivision (b) to apply.[6] That said, we are not persuaded *McDonough* requires a new trial.

The decision in *McDonough* arose from a civil suit filed in federal court under its diversity jurisdiction, in which a child and his parents sued an equipment manufacturer for injuries suffered by the child when riding on a lawnmower. (*McDonough*, *supra*, 464 U.S. at p. 549.) During voir dire, the jurors were asked whether they or any of their immediate family members had sustained any accidental injuries resulting in disability or prolonged pain and suffering. (*Id*. at p. 550.) After a verdict had been rendered in favor of the manufacturer, the plaintiffs brought a motion for new trial on the ground that one of the jurors had failed to disclose his son had been injured when a truck tire exploded. (*Id*. at pp. 550-551.) The district court denied the motion but the court of appeals reversed, accepting the plaintiffs' argument that the juror's concealment of information, even if made in good faith, had impaired the plaintiffs' right to exercise a peremptory challenge. (*Id*. at pp. 552-553.)

The United States Supreme Court reversed the decision of the court of appeals because a new trial was not appropriate absent a showing of prejudice under Rule 61 of the Federal Rules of Civil Procedure. (*McDonough*, *supra*, 464 U.S. at pp. 552-555.) It stated: "A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the

---

[6] The charges against appellant were initiated by a criminal complaint filed February 9, 2012, about nine months after Dahm's appearance at the hearing.

16

peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination. . . . We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of the trial." (*Id*. at pp. 555-556.)

Appellant's argument presumes that the quoted language in *McDonough* establishes a two-pronged test that requires a new trial in state court criminal proceedings, regardless of actual bias or prejudice, whenever a juror has concealed a material fact during voir dire and a correct response would have provided grounds for a challenge for cause under state law. We do not agree. *McDonough* does not directly apply to a California criminal trial because it involved an implementation of a rule of federal civil procedure, rather than an interpretation of the federal Constitution. "Federal rules based on the supervisory power of the United States Supreme Court over the administration of justice in the federal courts . . . are not binding on the states." (*People v. Thayer* (1965) 63 Cal.2d 635, 639; see *People v. Guiton* (1993) 4 Cal.4th 1116, 1126 (*Guiton*).) And, even if we were to agree that the "two-prong test" of *McDonough* applied to this case, and that appellant's trial counsel would have been entitled to excuse Juror No. 8 for cause if the prior representation by the public defender had been disclosed during voir dire, it does not follow that a new trial should be granted when the presumption of prejudice can be rebutted.

Appellant observes that in *People v. Ledesma* (2006) 39 Cal.4th 641, 669-670 (*Ledesma*), our state Supreme Court described implied bias under Code of Civil Procedure section 229 as "a presumption of bias that could not be overcome by a finding that [the juror] could be fair and impartial." *Ledesma* does not assist appellant. The cited comment was part of a discussion in which the court rejected the defendant's claim that a juror who was employed as a corrections officer should have been excused for cause during voir dire based on implied bias. (*Ibid*.) The case says nothing about what should

17

happen when a juror who would be subject to a challenge for cause based on one of the statutory grounds listed in Code of Civil Procedure section 229 actually sits on the jury and the issue is raised for the first time in a motion for new trial. Penal Code section 1181, subdivision 3 provides for a new trial based on juror misconduct "by which a fair and due consideration of the case has been prevented." The high court in *McDonough* emphasized that in light of the resources invested in a trial, a judgment should only be set aside where a juror's concealment of information affects the fairness of the trial, in other words, when prejudice has been established. (*McDonough*, *supra*, 464 U.S. at pp. 553-556; see *Diaz*, *supra*, 152 Cal.App.3d at p. 938 [contrasting juror misconduct discovered during trial with juror misconduct issue raised in posttrial proceedings].)

In an analogous context, this court has addressed the analysis to be employed when a juror who is disqualified from jury service due to a felony conviction fails to disclose that ex-felon status during voir dire. (*People v. Green* (1995) 31 Cal.App.4th 1001, 1017-1020 (*Green I* ); Code of Civ. Proc., § 203, subd. (a)(5).) In such a situation, the concealment of an ex-felon status is juror misconduct giving rise to a presumption of prejudice, but this presumption is subject to rebuttal. (*Green I*, at pp. 1017-1020.) We see no reason for establishing a more stringent standard for the concealment of a status that would allow a challenge for cause based on implied bias under Code of Civil Procedure section 229.[7]

---

[7] The defendant in *Green I* subsequently filed a petition for writ of habeas corpus in federal district court under the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254. Although the district court denied the petition, the defendant prevailed in an appeal to the Ninth Circuit Court of Appeals, which ruled that this court's decision affirming the judgment in *Green I* was "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." (*Green v. White* (9th Cir. 2000) 232 F.3d 671, 672, 675-676 (*Green II* ).) The Ninth Circuit concluded the prosecution had not rebutted the presumption of prejudice arising from the juror misconduct, which went far beyond the concealment of ex-felon status and included statements by the juror during deliberations that he knew the defendant was guilty the moment he saw him and that he wanted to kill the defendant himself. (*Green II*, at pp. 673, 676.) Though the Ninth Circuit disagreed with the conclusion in *Green I* that prejudice had been rebutted, nothing in *Green II* suggests a juror's concealment of

18

We acknowledge federal cases recognizing that even in the absence of actual bias, "in rare instances a court will find implied bias, which is 'bias conclusively presumed as a matter of law.' " (*United States v. Olsen* (9th Cir. 2013) 704 F.3d 1172, 1191 [juror's conversations with friend about the case when it was reported in the news a year before the trial did not support finding of implied bias].) Such bias should be presumed only in " 'extreme' " or " 'extraordinary' " cases, and has been recognized only in two contexts: "first, 'in those extreme situations "where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances," ' [citation] and second, 'where repeated lies in voir dire imply that the juror concealed material facts in order to secure a spot on the particular jury.' " (*Id*. at pp. 1191-1192.)

The bias that is implied statutorily under state law by virtue of a recent attorney-client relationship is not comparable to the extreme and extraordinary situations in which bias is presumed under federal law and may not be rebutted. Code of Civil Procedure section 229, subdivision (b) applies only to relationships existing within one year of the filing of the complaint in the case being tried; if the Legislature had believed a previous attorney-client relationship was so inherently prejudicial that bias could not be rebutted in the context of a posttrial juror misconduct claim, we think it unlikely the provision would have extended only to those relationships falling within a one-year time frame. (Compare *United States v. Gonzalez* (9th Cir. 2000) 214 F.3d 1109, 1111-1114 [implied bias found where ex-husband of juror in cocaine distribution case had used and dealt cocaine, contributing to the breakup of the family]; *Dyer v. Calderon* (9th Cir. 1998) 151 F.3d 970, 972-974, 979-985 [bias implied where juror in murder case denied during voir dire that she or any family member had been a victim of a crime or accused of a crime; among other things, her brother was victim of a homicide and was killed in a manner similar to the victims in the case on which she sat and her husband had been arrested for rape];

ex-felon status during voir dire requires reversal in the absence of actual bias or prejudice when the issue is raised in a posttrial proceeding.

19

*Tinsley v. Borg* (9th Cir. 1990) 895 F.2d 520, 526-529 [no implied bias on part of juror in rape case who had counseled rape victims as part of her job as social worker when neither she nor a close friend or family member had been a victim of rape]; *United States v. Eubanks* (9th Cir. 1979) 591 F.2d 513, 517 [implied bias where sons of juror in a heroin distribution case were themselves heroin users who were serving prison sentences]; *United States v. Allsup* (9th Cir. 1977) 566 F.2d 68, 71-72 [court should have granted challenge for cause to two prospective jurors who worked for different branches of the bank the defendant was accused of robbing].)

Any bias implied under Code of Civil Procedure section 229, subdivision (b) was rebutted for reasons already discussed. The trial court did not err in denying the motion for new trial based on juror misconduct.

B. *Evidence of First Degree Murder*

The jury was instructed on two theories of first degree murder: (1) willful, deliberate and premeditated murder; and (2) murder by lying in wait. (Pen. Code, § 189.) In his motion for new trial, appellant argued the verdict for first degree murder under either of these theories was "contrary to . . . [the] evidence" under Penal Code section 1181, subdivision 6. Appellant contends the trial court abused its discretion in denying his motion for new trial on this ground, and further argues the evidence was insufficient to support a conviction of first degree murder under either theory. We conclude he is not entitled to a modification of the judgment or a new trial.

In ruling on a motion for new trial under Penal Code section 1181, subdivision 6, the trial judge examines the evidence to determine whether it is sufficient to prove each element beyond a reasonable doubt to his or her satisfaction, effectively sitting as a "13th juror." (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133; see *People v. Robarge* (1953) 41 Cal.2d 628, 633 (*Robarge*).) "The trial court has broad discretion in determining whether the evidence has sufficient probative value to sustain the verdict [citation], and its order will not be reversed on appeal 'absent a manifest and unmistakable abuse of that discretion.' " (*People v. Dickens* (2005) 130 Cal.App.4th

20

1245, 1252.) In its written order, the trial court appropriately indicated it was required to independently review the evidence when considering whether the first degree murder verdict was contrary to the evidence, and appellant does not contend the trial court misconstrued the scope of its discretion. (See *Robarge*, at p. 633; compare *People v. Carter* (2014) 227 Cal.App.4th 322, 328.)

Where, as here, the trial court understood the scope of its discretion under Penal Code section 1181, subdivision 6, our standard of review dovetails with the standard for assessing the sufficiency of the evidence on appeal, which requires us to consider "the entire record in the light most favorable to the judgment below to determine whether it contains substantial evidence—that is, evidence which is reasonable, credible, and of solid value—from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1068-1069 (*Mendoza*); see *People v. Watkins* (2012) 55 Cal.4th 999, 1018-1020 [substantial evidence standard applied on appeal when trial court denied motion for new trial based on insufficient evidence under Pen. Code, § 1181, subd. 6.) We conclude substantial evidence supports the conviction of first degree murder under a theory of premeditation and deliberation, and that consequently, the trial court did not abuse its discretion in concluding the verdict was not contrary to the evidence. (See *People v. Lewis* (2001) 26 Cal.4th 334, 365 (*Lewis*).)

" ' "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.]" ' " (*Mendoza*, *supra*, 52 Cal.4th at p. 1069.) "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse. [Citations.] However, the requisite reflection need not span a specific or extended period of time." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), the state Supreme Court identified three categories of evidence relevant to the presence of premeditation

21

and deliberation: (1) planning activity, (2) motive, and (3) the manner of the killing. (*Mendoza*, *supra*, 52 Cal.4th at p. 1069.) Though these so-called *Anderson* factors are not exhaustive or exclusive of other considerations (*ibid.*), their application to the present case supports a finding the murder was premeditated.

We turn first to planning. The evidence does not show appellant went to the shelter expecting to find or confront Smith, but it does show that several minutes elapsed between the time appellant was aware of Smith's presence and the stabbing itself. Although appellant testified that he had put the knife in his pocket before sitting down in the chair to sleep, the jury was not required to credit this testimony and could have concluded that he retrieved the knife from his bag after his first encounter with Smith. Viewed in the light most favorable to the judgment, appellant had ample time to pause and reflect before the killing. " ' " 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " (*Mendoza*, *supra*, 52 Cal.4th at p. 1069.)

The prosecution also presented evidence of motive, the second *Anderson* factor. Whitey Pavao testified that before appellant stabbed Smith, he said something about money, like "he won't rip off anybody anymore" or "you're not going to steal something from somebody else." This was consistent with a statement Pavao gave to police officers on the night of the stabbing, in which he told them "the guy who did the stabbing said I guess you're not going to rip anyone off anymore or something, but I remember him saying something to that effect about money and stealing the money, about money, okay" and "yeah, he said yeah, yeah, you're not going to steal something from somebody else." The jury was entitled to credit Pavao's trial testimony and prior consistent statement to police and to conclude appellant stabbed Smith because he believed Smith had stolen from him or was about to steal from him. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1238 [sufficient evidence of premeditation and deliberation where defendant was motivated by "an incomprehensible need for revenge over the theft of his rifle"; "the incomprehensibility of the motive does not mean that the jury could not reasonably infer that the defendant entertained and acted on it"].)

Finally, the manner of the killing supports a determination appellant acted with premeditation and deliberation. Appellant stabbed Smith in the heart, a vital area of the body. (See *People v. Bolden* (2002) 29 Cal.4th 515, 561.) A " 'particular and exacting' " killing allows the jury to infer deliberation and premeditation, and supports a conviction of first degree murder. (*People v. Caro* (2012) 46 Cal.3d 1035, 1050, disapproved on another ground as stated in *People v. Whitt* (1990) 51 Cal.3d 620, 657, fn. 29; *People v. Garcia* (2000) 78 Cal.App.4th 1422, 1428.) Shelter worker James Joyner told police that after the stabbing, appellant followed Smith as he staggered away, looking like he wanted to "finish the job," and, when he identified appellant that same night in a lineup, he told officers appellant "was trying to finish him (Smith) off." Joyner's statements (and his similar testimony at trial) strongly suggest the stabbing was a part of a deliberate plan to kill Smith rather than the accident described by appellant.

Because the evidence was sufficient to support a conviction of first degree premeditated murder, we need not consider whether it also supported a conviction under a lying-in-wait theory. Any deficiency in the evidence of lying in wait is harmless "absent an affirmative indication in the record that the verdict actually did rest" on the lying-in-wait theory. (*Guiton*, *supra*, 4 Cal.4th at p. 1129 [where case given to jury on different factual theories, one of which is not supported by the evidence, court presumes the jurors rejected that theory and based the verdict on the factually supported theory].) The record does not affirmatively indicate the jury relied on lying in wait rather than premeditation as a basis for first degree murder, and appellant was not entitled to a new trial, or to reversal of the judgment, even if we assume for the sake of argument that the evidence did not support a lying-in-wait theory.

Appellant argues that the first degree murder conviction cannot stand because the testimony of Whitey Pavao was "incoherent, inconsistent and contradicted by the videotape of the incident." We do not agree. " 'It is blackletter law that any conflict or contradiction in the evidence, or any inconsistency in the testimony of witnesses must be resolved by the trier of fact who is the sole judge of the credibility of the witnesses. It is well settled in California that one witness, if believed by the jury, is sufficient to sustain a

verdict.  To warrant the rejection by a reviewing court of statements given by a witness who has been believed by the trial court or the jury, there must exist either a physical impossibility that they are true, or it must be such as to shock the moral sense of the court; it must be inherently improbable and such inherent improbability must plainly appear.  [Citations.]' " (*People v. Breault* (1990) 223 Cal.App.3d 125, 140-141; see *People v. Young* (2005) 34 Cal.4th 1149, 1181.)

A person may be disqualified as a witness only if he or she is "(1) Incapable of expressing himself or herself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him; or [¶] (2) Incapable of understanding the duty of a witness to tell the truth." (Evid. Code, § 701, subd. (a); see Evid. Code, § 700; *People v. Mincey* (1992) 2 Cal.4th 408, 444.)  Even mentally ill and delusional witnesses are qualified to testify, and it was up to the jury (and the trial court, in ruling on the motion for new trial) to decide how much of Pavao's testimony should be credited.  (See *Lewis*, *supra*, 26 Cal.4th at pp. 357-358 [although testimony "may have consisted of inconsistencies, incoherent responses, and possible hallucinations, delusions and confabulations, [the witness] 'presented a plausible account of the circumstances of [the victim's] murder' "].)

Pavao's testimony was disjointed and odd at certain points, but his description of the stabbing was relatively straightforward and consistent with what he told police officers when interviewed that same night. The jury watched the surveillance video and could determine for itself whether Pavao's testimony was contradicted in any way by what was captured on camera.  Pavao was impeached with evidence of his chronic use of alcohol and he acknowledged on cross-examination he sometimes had visions, including a vision of a stabbing incident at the shelter that was similar to the actual event involving appellant and Smith.  But nothing in Pavao's description of the incident was physically impossible or inherently improbable, and we will not second guess the jury or the trial court in their evaluation of the weight to be given to his testimony.

Framing the argument slightly differently, appellant argues the prosecution failed to carry its burden of showing he did not act as a result of a "sudden quarrel or heat of

passion" that rendered the killing voluntary manslaughter rather than murder. (Pen. Code, § 192, subd. (a).) We disagree.

The provocation variant of voluntary manslaughter "has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. As we explained long ago in interpreting the same language of section 192, 'this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1252-1253.) A person acts upon a sudden quarrel or in the heat of passion if he or she "acts without reflection in response to adequate provocation." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) Provocation is legally adequate if it " ' "would cause the ordinarily reasonable person of average disposition to act rashly and . . . from . . . passion rather than from judgment." ' " (*Ibid.*)

There is little if any evidence to show adequate provocation under this standard. Crediting appellant's own testimony, Smith ran into or hit appellant while appellant was sleeping in a chair, glared at him, and approached him a few minutes later with a newspaper in his hands, conduct that falls far short of the kind that would cause an ordinarily reasonable person to act out of passion rather than from judgment. Smith's acts were not the kind that would give rise to "an emotion that obliterates reason that would prevail in the mind of a reasonable person." (*People v. Johnson* (2003) 113 Cal.App.4th 1299, 1311.) Certainly, the evidence did not compel a verdict of voluntary manslaughter as a matter of law, and does not require us to set aside the jury's verdict or the trial court's ruling on the motion for new trial.

Appellant finally argues that his conviction should be reduced to involuntary manslaughter because the evidence showed that at worst, he acted in imperfect self-defense, but without express or implied malice. We reject this argument, having

25

already concluded that substantial evidence supports a finding of premeditated and deliberate first degree murder.

## C. *Evidence of Second Knife*

Appellant argues the trial court erred in admitting evidence that on the night of the stabbing, he was in possession of a weapon not used in the commission of the offense. Whether we view the challenge as being to the trial court's ruling admitting the evidence at trial, or to its order denying a motion for new trial on that ground (Pen. Code, § 1181, subd. 5), we review the claim for abuse of discretion and find none. (See *People v. Harris* (2005) 37 Cal.4th 310, 337 [evidentiary ruling reviewed for abuse of discretion]; *People v. Delgado* (1993) 5 Cal.4th 312, 328 (*Delgado*) [ruling on motion for new trial reviewed for abuse of discretion].)

Over defense objection, the court indicated it would allow the prosecution to elicit evidence that appellant's bag, which was found in the homeless encampment near the shelter, contained a black-handled, fixed-blade steak knife in a cardboard sandwich bag box, which was wrapped in plastic sandwich bags and buried underneath other plastic sandwich bags. The parties stipulated that the steak knife was not used to stab Smith and did not carry Smith's DNA, although appellant's DNA was found on the knife. Appellant argues, as he did in his motion for new trial, that the evidence regarding the second knife was inadmissible because it was not used to stab Smith.

In *People v. Riser* (1956) 47 Cal.2d 566, 576-577 (*Riser*), disapproved on other grounds in *People v. Chapman* (1959) 52 Cal.2d 95, 98 and *People v. Morse* (1964) 60 Cal.2d 631, 637, fn. 2, the court held inadmissible evidence of guns, holsters and ammunition that had not been used in the commission of the charged murder. The court explained that when the prosecution relies on a specific type of weapon used to commit a homicide, a trial court should exclude "evidence that other weapons were found in [the defendant's] possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*Riser,* at p. 577.) Similarly, in *People v. Henderson* (1976) 58 Cal.App.3d 349 (*Henderson*), the

court concluded that a handgun found during a search of the defendant's apartment, which he had not used in the charged assaults, was inadmissible because "[e]vidence of possession of a weapon not used in the crime charged against a defendant leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons—a fact of *no relevant* consequence to determination of the guilt or innocence of the defendant." (*Henderson*, at p. 360; see *People v. Archer* (2000) 82 Cal.App.4th 1380, 1392 [knives found in defendant's backyard two years after the murder that were determined not to be the murder weapons were irrelevant to show planning or the availability of weapons]; *People v. Witt* (1958) 159 Cal.App.2d 492, 497 [weapons found in defendant's car, which were not stolen during the charged burglary, were inadmissible].)

On the other hand, evidence of a weapon not used in the commission of the charged crime is admissible when relevant to other issues in the case. In *People v. Smith* (2003) 30 Cal.4th 581, 613, a murder defendant who had fatally shot the victim claimed to have taken the gun to the scene for the sole purpose of intimidation, and testified he had selected that gun because it was small and easy to conceal. Under these circumstances, evidence that the defendant owned another small gun for which he had no ammunition was relevant because "[a]n unloaded gun fully serves to intimidate; a loaded gun is necessary only to actually shoot." (*Id*. at p. 614.) In *People v. Jablonski* (2006) 37 Cal.4th 774, 821-823, a defendant convicted of two murders argued the trial court should have excluded evidence that a roll of duct tape, homemade wire handcuffs and a stun gun were found in his car at the time of his arrest in another state. The Supreme Court disagreed, as the evidence, though not used in the charged offense, suggested the defendant had planned to take the victims by surprise by immobilizing them and was relevant to whether he had acted with premeditation. (*Ibid*.)

Appellant argues the steak knife found in his bag had no relevance other than to show he was the sort of person who carried weapons, and should have been excluded under *Riser* and *Henderson*. The People respond that the steak knife was relevant to issues other than appellant's propensity to carry weapons because (1) Whitey Pavao and

27

one of the shelter workers, James Joyner, described the knife they saw appellant holding in a manner that was consistent with the steak knife, suggesting appellant was holding a second knife when he stabbed Smith; and (2) if appellant possessed a fixed-blade knife but chose to stab Smith with a folding knife that was more readily concealed, this would tend to support the theory that he acted with premeditation and/or was lying in wait.

We need not determine whether evidence of the second knife was admissible on these grounds because any error in admitting it was harmless. Even without evidence of the second knife, the jury would have known that appellant carried the folding knife used in the stabbing and had taken it inside the shelter despite the no-weapons policy. (See *Riser*, *supra*, 47 Cal.2d at pp. 577-578 [defendant not prejudiced by evidence of gun, holster and ammunition not used in the killing because even without that evidence, jurors would have known the defendant possessed firearms].) Appellant testified that he carried the knife for protection, and the testimony of shelter workers and the defense expert on homelessness established that it was not unusual for homeless individuals to carry small weapons for this purpose. The jury knew appellant was homeless and was likely carrying many of his possessions with him; it is not particularly noteworthy that he would have had a kitchen knife among his belongings. We cannot say it is reasonably probable a result more favorable to appellant would have been reached if evidence of the second knife had been excluded. (*People v. Nelson* (1964) 224 Cal.App.2d 238, 256, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) The trial court did not abuse its discretion in denying appellant's motion for new trial based on the evidence of the second knife. (Pen. Code, § 1181, subd. 5.)

D. *Newly Discovered Evidence*

Finally, appellant argues the trial court should have granted his motion for new trial under Penal Code section 1181, subdivision 8, which applies "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." Our standard of review is abuse of

28

discretion, and, finding none, we reject the claim. (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1151 (*Mehserle*); *Delgado*, *supra*, 5 Cal.4th at p. 328.)

A defendant is entitled to a new trial based on newly discovered evidence when he or she can show " ' "1. That the evidence, and not merely its materiality, be newly discovered;  2. That the evidence be not cumulative merely;  3. That it be such as to render a different result probable on a retrial of the cause;  4. That the party could not with reasonable diligence have discovered and produced it at the trial;  5. That these facts be shown by the best evidence of which the case admits." ' " (*Delgado*, *supra*, 5 Cal.4th at p. 328.)  "A new trial motion based on newly discovered evidence is looked upon with disfavor." (*Mehserle*, *supra*, 206 Cal.App.4th at p. 1151.)

The evidence on which appellant relied for this aspect of the motion was a declaration by Eugene Lemelle (Bubble), another client of the homeless shelter who witnessed the stabbing.  Appellant had testified that Bubble was present in the room at the time of the stabbing and that after he (appellant) had thrown the knife down, Bubble kicked it back to him and advised him to leave.  In his declaration, Lemelle stated: "When I first saw Abdul Smith, he was in the TV Room.  Smith was underneath the television spinning and twirling around in an erratic and aggressive fashion.  It appeared as if he was getting ready to attack or hurt someone.  [¶] I then saw Abdul Smith charge through the chairs at [appellant] and attack [appellant].  The two men came together and then Smith walked away.  I did not actually see anyone being stabbed, but I saw that Smith had blood on his shirt as he walked away.  I saw Smith walk over to where the coffee machine is located and fall on the ground.  [¶] After the incident, [appellant] had a shocked look on his face.  Based on what I saw, I believe that [appellant] acted to defend himself against Smith, who was behaving aggressively before attacking [appellant].  Based on my observations prior to the encounter between Smith and [appellant], [appellant] acted as if he did not wish to fight with or engage with Smith.  Based on what I saw, I believe that Smith was the aggressor and that Smith attacked [appellant] without reason.  [¶] After the incident, I told [appellant] that he should leave.  I saw a knife on the floor and kicked it over to where [appellant] was seated.  I saw [appellant] pick up the

29

knife and then leave the shelter." Although Lemelle was contacted by a defense investigator during the trial, "I did not wish to testify at that time because I was being prosecuted for a drug offense and did not wish to be questioned about my pending criminal case." Lemelle provided a statement to the defense on May 24, 2013, more than a month after the verdict was returned in appellant's case.

The trial court denied the motion for new trial on this basis, concluding the evidence was not newly discovered because appellant had known Lemelle was an eyewitness as early as the date of the stabbing. The court noted, "[C]onspicuously absent from [appellant]'s motion is any evidence as to when Lemelle's identity was first known, and any explanation for the failure to pursue potential evidence the existence of which was known to [appellant] from the time of the incident." It concluded appellant "is not excused from using reasonable diligence to secure an identified witness by awaiting a verdict before seeking to introduce the testimony, and then asserting in a new trial motion merely that Lemelle's concerns about his own case precluded interviewing and calling him to testify. Had Lemelle been subpoenaed, the court and counsel would know whether he would have invoked his Fifth Amendment right against compelled self-incrimination. If so, the court could have conducted an inquiry outside the jury's presence to determine the legitimacy of Lemelle's invocation of the privilege and fashioned an appropriate remedy." The court also concluded it was not reasonably probable Lemelle's testimony would result in a more favorable result for appellant on retrial.

Lemelle's testimony did not amount to newly discovered evidence because his identity and status as an eyewitness were known to appellant before he even fled the shelter, and he was interviewed by a defense investigator during the trial. The court did not abuse its discretion in concluding the defense did not exercise reasonable diligence to procure Lemelle's testimony at trial because Lemelle's vaguely described concern about unrelated charges does not appear to have any bearing on his status as a witness for appellant.

This is not the end of our review, because case law has recognized that a lack of diligence is not necessarily a sufficient basis for denial of a motion for new trial where "the newly discovered evidence would probably lead to a different result on retrial." (*People v. Martinez* (1984) 36 Cal.3d 816, 825.) "Numerous cases hold that a motion for a new trial should be granted when the newly discovered evidence contradicts the strongest evidence introduced against the defendant." (*Id.* at p. 823.)

Lemelle's declaration does not contradict the strongest evidence against appellant. Though Lemelle characterized Smith's purported "spinning" as aggressive, he did not say Smith had any sort of weapon that might warrant the use of deadly force against him. And, although Lemelle said Smith "attacked" appellant, appellant himself testified that he pulled out the knife in self-defense and Smith "charged" or "lunged" or "came at" him, falling accidentally into the knife. Lemelle did not come forward after the trial with his version of events, a circumstance that would diminish his credibility as a witness. The trial court did not abuse its discretion in concluding it was not reasonably probable Lemelle's testimony would result in a more favorable verdict to the defense on retrial.

## III.  DISPOSITION

The judgment is affirmed.

_____
NEEDHAM, J.

We concur.


_____
SIMONS, ACTING P.J.



_____
BRUINIERS, J.

31